UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-CR-20025-MARTINEZ

UNITED STATES OF AMERICA,

v.

CARL FIORENTINO,

Defendant.
_____/

**PLEA AGREEMENT**

The United States of America and Carl Fiorentino (hereinafter "defendant") enter into the following agreement:

1. The defendant understands that he has the right to have the evidence and charges against him presented to a federal grand jury for determination of whether or not there is probable cause to believe he committed any offenses for which he is not currently charged by indictment. Understanding this right, and after full and complete consultation with his counsel, the defendant agrees to waive in open court his right to prosecution by indictment for any offenses referenced in this Plea Agreement, and agrees that the United States may proceed by way of an Information to be filed pursuant to Rule 7 of the Federal Rules of Criminal Procedure.

2. The defendant agrees to plead guilty to an Information to be filed in the future, that will charge the defendant with two felony offenses: (1) one count of conspiracy to commit mail fraud and wire fraud, in violation of Title 18, United States Code, Section 1349; and (2) one count of tax evasion, in violation of Title 26, United States Code, Section 7201. In exchange for defendant's agreement to plead guilty to the Information as set forth above, and for fulfilling all

(Exhibit)

of his other obligations set forth in the Plea Agreement, and subject to the limitations and provisions set forth in this Agreement, the Office of the United States Attorney for the Southern District of Florida and the Office of the United States Attorney for the Eastern District of New York (hereinafter, collectively "Office"), agrees to dismiss, at the time of sentencing, the remaining counts in the Indictment in *United States v. Carl Fiorentino*, No. 14-20025-CR-Martinez (S.D. Fla.), and to not otherwise prosecute defendant for offenses arising out of the conduct described in paragraph 18 below. This Agreement includes only the conduct set forth in paragraph 18 below, and excludes crimes of violence, any other conduct not set forth in paragraph 18 below, and any other proceeding or investigation which may be pending at the time this Agreement is signed. This Agreement is also limited to this Office, and as such, does not and cannot bind other federal, state, regulatory, or local prosecuting authorities.

3. The defendant is aware that the sentence will be imposed by the Court after considering the Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"). The defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a Pre-Sentence Investigation by the Court's probation office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose that sentence; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either

more severe or less severe than the Sentencing Guidelines' advisory sentence. Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offenses identified in paragraph 2, and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

4. The defendant also understands and acknowledges that the Court may impose a statutory maximum term of imprisonment of up to twenty (20) years for the Information as to Count One and up to five (5) years as to Count Two, followed by a term of supervised release of up to three (3) years as to each count. In addition to a term of imprisonment and supervised release, the Court may impose a fine of up to $250,000 or double the gross proceeds, and must order restitution. The defendant agrees that he will make restitution in an amount determined by the Court and as set forth in paragraphs 5 and 6 of this Agreement. The defendant understands and agrees that the government and any victim may provide evidence to the Court for the purpose of a determination as to restitution.

5. The defendant agrees to sign a Form 906 Closing Agreement with the IRS prior to the date of sentencing for the tax years 2007 through 2010. Further, the defendant will provide the IRS with any and all information requested by the IRS regarding the years covered by the Closing Agreement. The defendant further agrees to pay and will promptly pay *in full* the remaining liability for additional income taxes, penalties and interest as determined by or resulting from the provisions of the Closing Agreement for the tax years 2007 through 2010 as well as any additional amounts determined by the IRS prior to the date of sentencing. The defendant may be excused from this obligation to pay *in full* such monies *prior* to sentencing under this provision, if the United States in its discretion, or the Court determines after a request

3

by the defendant for such a determination if there has been no agreement with the United States, that the defendant is financially unable to pay *prior* to sentencing. The defendant will then enter into an agreement with the IRS as to a payment plan. The defendant further agrees that the taxes due and owing to the IRS, excluding interest and penalties, for the tax years 2007 through 2010 are, at least, as follows:

| Form Year | Amount |
|---|---|
| 2007 | $ 1,409,640 |
| 2008 | $    170,116 |
| 2009 | $    187,375 |
| 2010 | $      43,629 |
| **Total:** | **$ 1,810,760** |

Nothing in this agreement shall limit the IRS in its lawful examination, determination, assessment, or collection of any taxes, penalties or interest due from the defendant for the time period(s) covered by this agreement or any other time period. The defendant further agrees that within 14 days of the entering of the defendant's guilty plea, the defendant will provide a truthful and complete IRS Form 433-A to an official of the Internal Revenue Service designated by the United States, as well as to both the undersigned Assistant United States Attorneys and IRS Special Agent Aileen Martinez. The defendant agrees not to conceal, transfer, or dissipate funds or property that could be used to satisfy such taxes, penalties, and interest.

6. The defendant also agrees that he shall assist the United States in all proceedings, whether administrative or judicial, involving the forfeiture to the United States of all right, title, and interest, regardless of their nature or for, min all assets, including real or personal property, cash or other monetary instruments, wherever located, which the defendant or others to his knowledge have accumulated as a result of the defendant's illegal activities. The defendant further agrees to forfeit to the United States voluntarily and immediately all of his right, title and

interest in all assets that, pursuant to Title 18, United States Code, Section 981(a)(1)(C), constitute or are derived from proceeds the defendant obtained, directly or indirectly as a result of the unlawful activity as set forth in Count One, or is property traceable to such property, including the following property:

> 1) $7,500 in cash from Wells Fargo bank account ending in X-5221;
> 2) Any financial interest in, or licenses related to, professional sports tickets, including any such license or interest related to the ATP Sony Ericsson Open Tennis Event in Key Biscayne, Florida;
> 3) All interest in 100 shares of the securities of "GOGO.com;"
> 4) Any proceeds from any estate sale of items in 2014;
> 5) Any home furnishing or art object valued at greater than $5,000, including one chandelier;
> 6) Jewelry, including watches, valued at approximately $40,000;
> 7) Any interest related to accounts receivable related to Honey Hollow Wagyu, valued at approximately $50,000;
> 8) Any interest related to accounts receivable related to Honey Hollow Ranch, valued at approximately $87,000;
> 9) Any interest related to Wagyu cattle, located at Honey Hollow Ranch in Jacksboro, Texas, or elsewhere; and
> 10) $1,961,049.90, and all proceeds traceable thereto, as proceeds from the defendant's December 2013 sale of his former residence at 130 Casuarina Concourse, Coral Gables, Florida.

Additionally, defendant agrees to identify as being subject to forfeiture all such assets, and assist in the transfer of such property to this Office, the Federal Bureau of Investigation, or any third party as directed, all necessary and appropriate documentation with respect to said assets, including consents to forfeiture, quit claim deeds and any and all other documents necessary to deliver good and marketable title to said property.

7. The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 4 of this Agreement, a special assessment in the amount of $200 will be imposed on the defendant. The defendant agrees that any special assessment imposed shall be paid at the time of sentencing.

8.  The Office reserves the right to inform the Court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this Agreement, the Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

9.  The United States agrees that it will recommend at sentencing that the Court reduce by two levels the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1(a) of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility. If at the time of sentencing the defendant's offense level is determined to be 16 or greater, the government will make a motion requesting an additional one level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines, stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently. The United States, however, will not be required to make these recommendations if the defendant: (1) fails to fulfill all of his obligations under this Plea Agreement; (2) fails or refuses to make a full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (3) is found to have misrepresented facts to the government prior to entering into this Plea Agreement; or (4) commits any misconduct after entering into this Plea Agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

10.    The Office and the defendant agree that, although not binding on the probation office or the Court, they will jointly recommend that the Court make the following findings and conclusions as to the sentence to be imposed on the count to which the defendant shall plead:

    a.    <u>Applicable Guideline Offense and Base Offense Level</u>:

Pursuant to Section 2B1.1 of the Sentencing Guidelines, the offense guideline applicable to Count One, the base offense level is 7.

    b.    <u>Specific Offense Characteristics</u>:

The parties agree and stipulate that the following offense characteristics apply:

(1) The loss was greater than $7 million but not more than $50 million for the purpose of an increase under Section 2B1.1(b)(1), and the parties may argue or present evidence to the Court at sentencing as to the appropriate actual loss figure within this range; (2) a substantial part of the fraudulent scheme was committed from outside the United States; and the offense otherwise involved sophisticated means, for a two-level increase under Section 2B1.1(b)(10)(B)-(C).

    c.    <u>Adjustments</u>

The parties further agree that the following adjustments apply:

(1) The offense involved abuse of a position of trust for a two-level enhancement under Section 3B1.3; and the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation or prosecution of the instant offense of conviction, and the obstructive conduct related to the



defendant's offense of conviction and any relevant conduct, for a two-level increase under Section 3C1.1.[1]

11. The defendant is aware that the sentence has not yet been determined by the Court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office or the Court. The defendant understands further that any recommendation that the government makes to the Court as to sentencing, whether pursuant to this Agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. The defendant understands and acknowledges, as previously acknowledged in paragraph 3 above, that the defendant may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by the defendant, the government, or a recommendation made jointly by both the defendant and the government.

12. The defendant agrees that he shall cooperate fully with this Office by, among other things: (a) providing truthful and complete information and testimony, and producing documents, records and other evidence, when called upon by this Office, whether in interviews, before a grand jury, or at any trial or other court proceeding; (b) appearing at such grand jury proceedings, hearings, trials, and other judicial proceedings, and at meetings, as may be required

---

[1] The parties agree that pursuant to U.S.S.G. § 2T1.9, reference to § 2T1.1 would apply to Count Two, the tax evasion charge; the base offense level would be 22 due to tax loss of more than $1 million but not more than $2.5 million under the § 2T4.1 Tax Table; a two-level enhancement would apply under § 2T1.1(b)(1) as the defendant failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity; and an additional two-level enhancement would apply under § 2T1.1(b)(2) as the offense involved sophisticated means. Therefore, under § 2T1.9, for the tax offense charged in Count Two, the parties agree to a total offense level of 26. Under § 2B1.1, the guideline applicable for the fraud conspiracy charged in Count One, the parties agree to a total offense level of 35 or 33 (depending on the loss as calculated at sentencing), and before any reductions for acceptance of responsibility. Understanding that this is not binding on the Court, the parties jointly recommend that under § 3D1.2 the two offenses should be grouped as they involved the same course of conduct.



by this Office; and (c) if requested by this Office, working in an undercover role under the supervision of, and in compliance with, law enforcement officers and agents.

13. The Office reserves the right to evaluate the nature and extent of the defendant's cooperation and to make the defendant's cooperation, or lack thereof, known to the Court at the time of sentencing. If in the *sole and unreviewable judgment* of this Office the defendant's cooperation is of such quality and significance to the investigation or prosecution of other criminal matters as to warrant the Court's downward departure from *the advisory sentence* calculated under the Sentencing Guidelines, this Office may at or before sentencing make a motion consistent with the intent of Section 5K1.1 of the Sentencing Guidelines, or Rule 35 of the Federal Rules of Criminal Procedure subsequent to sentencing, reflecting that the defendant has provided substantial assistance and recommending that the defendant's sentence be reduced from the advisory sentence suggested by the Sentencing Guidelines. The defendant acknowledges and agrees, however, that nothing in this Agreement may be construed to require this Office to file any such motion(s) and that this Office's assessment of the nature, value, truthfulness, completeness, and accuracy of the defendant's cooperation shall be binding insofar as the appropriateness of this Office's filing of any such motion is concerned.

14. The defendant understands and acknowledges that the Court is under no obligation to grant the motion(s) referred to in this Agreement should the government exercise its discretion to file any such motion. The defendant also understands and acknowledges that the Court is under no obligation to reduce the defendant's sentence because of the defendant's cooperation.

15. The defendant is aware that Title 18, United States Code, Section 3742 affords the defendant the right to appeal the sentence imposed in this case. Acknowledging this, and in



exchange for the undertakings made by this Office in this Plea Agreement, the defendant hereby waives all rights conferred by Title 18, United States Code, Section 3742 to appeal the conviction, any sentence imposed, including any restitution order, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure from the guideline range that the Court establishes at sentencing. The defendant further understands that nothing in this Agreement shall affect this Office's right and/or duty to appeal as set forth in 18 U.S.C. § 3742(b). However, if this Office appeals the defendant's sentence pursuant to Section 3742(b), the defendant shall be released from the above waiver of appellate rights.[2]

16.   In the event the defendant withdraws from this Agreement prior to pleading guilty or breaches the Agreement before or after he pleads guilty to the charges identified in paragraph two (2) above or otherwise fails to fully comply with any of the terms of this Plea Agreement, this Office will be released from its obligations under this Agreement, and the defendant agrees and understands that: (a) the defendant thereby waives any protection afforded by any proffer letter agreements between the parties, Section 1B1.8 of the Sentencing Guidelines, Rule 11(f) of the Federal Rules of Criminal Procedure, and Rule 410 of the Federal Rules of Evidence, and that any statements made by the defendant as part of plea discussions, any debriefings or interviews, or in this Agreement, whether made prior to or after the execution of this Agreement,

---

[2] By signing this Agreement, the defendant acknowledges that he has discussed the appeal waiver set forth in this Agreement with his attorney. The defendant further agrees, together with this Office, to request that the District Court enter a specific finding that the defendant's waiver of his right to appeal the conviction or sentence to be imposed in this case was knowing and voluntary. The defendant acknowledges that no promises or inducements have been made with regard to this appellate waiver other than those contained in this agreement. By initialing below, the defendant and his attorney agree that they have discussed this matter, and the defendant is entering into this waiver knowingly, intelligently, and voluntarily.   Defendant \_\_\_\_ and Defense Counsel \_\_\_\_

10

will be admissible against the defendant without any limitation in any civil or criminal proceeding brought by the government; and (b) the defendant stipulates to the admissibility and authenticity, in any case brought by the United States in any way related to the facts referred to in this Agreement, of any documents provided by the defendant or the defendant's representatives to any state or federal agency and/or this Office.

17. The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status, if the defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, and, in some cases, removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including the defendant's attorney or the district court, can predict to a certainty the effect of the defendant's conviction on the defendant's immigration status. The defendant nevertheless affirms the desire to plead guilty regardless of any immigration consequences that the plea may entail, even if the consequence is automatic removal from the United States.

18. The defendant hereby (i) confirms that he has reviewed the following facts with legal counsel, (ii) adopts the following factual summary as his own statement, (iii) agrees that the following facts are true and correct, and (iv) stipulates that the following facts provide a sufficient factual basis for the plea of guilty in this case, in accordance with Rule 11(b)(3) of the Federal Rules of Criminal Procedure:

    A.    **Introduction**

    From in or around January 2003 through at least in or around April 2011, in the Southern District of Florida, the Eastern District of New York, and elsewhere, defendant Carl Fiorentino ("defendant" or "Fiorentino") conspired with others to receive undocumented compensation, or kickbacks, in the form of cash payments and the receipt of goods and services, from certain vendors and suppliers of his employer, Systemax, Inc. ("Systemax"). This compensation was

11



not disclosed to Systemax or its outside auditors and investors and was received contrary to representations Fiorentino made in the form of declarations and representation letters, regarding the disclosure of all compensation and any conflicts of interest with third parties. In effect, Fiorentino used his position at the company to unlawfully enrich himself and thereby caused Systemax to pay more to vendors for goods and services than it otherwise would have paid but for his conduct.

Fiorentino also wilfully attempted to evade and defeat the computation and payment of tax due and owing to the Internal Revenue Service ("IRS") with regard to his unlawfully obtained compensation and kickbacks, in the ascertainment, computation, assessment, and collection of federal income taxes during the period of the scheme.

### B. Defendant was a Senior Executive of Systemax Responsible for Purchasing From Vendors and Third-Parties

Fiorentino held himself out as the President of TigerDirect and CompUSA, which were subsidiaries of Systemax. Fiorentino lived in Miami, Florida and worked at Systemax's Miami offices. Systemax was a Fortune 1000 company that sold personal computers and other electronics through websites, retail stores and direct mail catalogs. Systemax conducted business under several brand names, including Tiger Direct, CompUSA and Circuit City. Fiorentino was a senior executive responsible for sourcing and purchasing various categories of computer and electronics peripherals, devices and other technology items from third parties, including vendors and suppliers located in Asia.

In approximately 2003, Fiorentino caused Systemax to form a new business relationship with a Taiwan-based supplier, RICI International and its affiliated companies, Top Supreme and Coaster Associates (collectively "RICI"). Prior to 2003, RICI had no real business at all, but during the period 2003 through 2011, RICI sold more than $150 million worth of computer and electronics goods and materials to Systemax. Between 2003 and 2011, Fiorentino received in excess of $9.5 million in kickbacks from RICI and its principals and agents, in the form of direct and indirect money transfers to Fiorentino, and payments to vendors who provided goods and services to Fiorentino.

Fiorentino concealed these payments from Systemax and its auditors and caused Systemax to pay more for such goods and services than it would have paid but for the kickback scheme. Separately, Fiorentino misappropriated merchandise from Systemax during the scheme.



### C. Bulk of Kickbacks Used to Purchase and Outfit Luxury Waterfront Residence in Coral Gables, Florida

During the period of the conspiracy, Fiorentino received millions of dollars from RICI for the purpose of purchasing a luxury waterfront residence at 130 Casuarina Concourse, Coral Gables, Florida, 33143 (the "Gables Estates Property"). Fiorentino purchased the Gables Estates Property in December 2007 for approximately $8.1 million, using a down payment of approximately $3.4 million that was provided by RICI but was transferred to the settlement agent by RICI via a third party to conceal its origin. Fiorentino also caused false and fraudulent documentation that inflated his income and assets to be submitted to the lending institution, TerraBank. Fiorentino also falsely claimed that the down payment was provided from his own personal funds that he earned through his position at Systemax. Furthermore, by falsely claiming the $3.4 million in kickback monies as his own legitimately accumulated wealth, Fiorentino obtained a $4 million dollar loan from TerraBank. Fiorentino obtained a separate $1 million loan from the seller of the Gables Estates Property to complete the purchase. Moreover, without the kickback monies from RICI, Fiorentino would not have been able to purchase the Gables Estates Property or afford the monthly mortgage payments and other property expenses solely using his salary from Systemax.

Fiorentino also received more than $1 million in additional kickbacks from RICI in the form of payments to vendors who supplied art, furnishings, high-end electronics and other goods and services for the Gables Estates Property. Many of these payments were made by RICI directly to the vendors at the specific direction of Fiorentino.

Thereafter, in approximately July 2010, during an Audit by the IRS, Fiorentino caused the creation of a fraudulent loan document that he backdated to 2007, to make it appear that he had received a $3.4 million loan from Top Supreme for the down payment for the December 2007 purchase of the Gables Estates Property. Fiorentino created this fake document and caused it to be submitted to his personal accountant and to the IRS, so he could conceal his receipt of kickback monies and evade paying taxes on this illicit income.

### D. Receipt of Additional Kickback Monies Through Third-Parties

Fiorentino created shell companies to conceal his receipt of millions of dollars' worth of additional kickbacks from RICI. For example, using his employee, S.K., who was a tennis coach for his children, Fiorentino created a shell company, Direct2UMall. This company was for the express purpose of receiving undisclosed kickbacks from RICI and others. In another aspect of the scheme, Fiorentino had a Systemax vendor based in California, P.J., wire transfer kickback payments to S.K. or to Direct2UMall so as to avoid detection.

13



The total value of kickbacks received by Fiorentino from RICI and third parties was approximately $9.8 million. However, the excess amount paid by Systemax to RICI and other third parties beyond the fair market value of the goods and services acquired from RICI as part of the scheme, was in excess of $9.8 million but was not more than approximately $28 million.

### E. Efforts to Obstruct the Criminal and Grand Jury Investigation

Upon learning that federal agents had questioned S.K. concerning Fiorentino's conduct, Fiorentino spoke with S.K. about his conversation with the federal agents. Upon learning that S.K. was asked about financial transactions with Fiorentino, Fiorentino told S.K. to say that the funds S.K. received constituted payments for tennis lessons to Fiorentino's family members. The implication was that S.K. should conceal the true nature of the financial arrangement between Fiorentino and S.K.

Separately, Fiorentino learned that P.J., who was located in California, had been interviewed by the FBI and the U.S. Attorney's Office for the Eastern District of New York in approximately June 2012. Fiorentino told P.J. that he and others at his company should use a false story to explain the purpose of the kickback payments to Fiorentino. Subsequently, in approximately September 2012, P.J. repeated this false story to federal law enforcement officials in the Eastern District of New York in an effort to conceal the illegal scheme and thwart the federal criminal investigation.

### F. Concealment of Income from IRS

For tax years 2007 through 2010, Fiorentino filed and caused to be filed certain tax returns and other tax-related forms and documents, including IRS Forms 1040 and 1099-MISC, on which he knowingly and wilfully underreported his income. Fiorentino also knowingly and wilfully concealed from others and the IRS the compensation paid to Fiorentino as part of the scheme referenced above. Among other things, Fiorentino caused various compensation to be paid to Fiorentino in the form of wire transfers by RICI to shell companies, third party vendors and others, so that the compensation would not be detected or reported on Forms 1040 and 1099-MISC or otherwise. Fiorentino thereby evaded the assessment of income, and defeated the IRS from being able to ascertain, retrieve or collect payment of the correct tax due and owing, and from imposing penalties and prohibitions against the defendant from engaging in such conduct. The tax loss associated with this conduct was more than $1 million but not more than $2.5 million.[3]

---

[3] I, Carl Fiorentino, after having completed plea negotiations and having reached a plea agreement with the United States, hereby affirm that I understand the foregoing and voluntarily and knowingly adopt the Factual Basis set forth in paragraph 18 as my own statement. This statement is intended to be a post-plea discussion statement and is not protected by Criminal Procedure Rule 11(e)(6) or Federal Rule of



19. This Office represents that the undersigned prosecutors are unaware of any information establishing the factual innocence of the defendant in the offenses referred to in paragraph two of this Agreement. This Office understands it has a continuing duty to provide such information establishing factual innocence of the defendant. The defendant understands that if this case proceeded to trial, this Office would be required to provide impeachment information relating to any informants or other witnesses. In addition, if the defendant raised an affirmative defense, this Office would be required to provide information in its possession that supports such a defense. Further, if this case proceeded to trial, this Office would be required to provide other information and materials in accordance with Fed. R. Crim. P. 16 and the Southern District of Florida's Standing Discovery Order. In return for the Government's promises set forth in this Agreement, the defendant waives the right to receive in discovery any such information and materials other than information and materials establishing the factual innocence of the defendant, and agrees not to attempt to withdraw the guilty plea or to file a collateral attack based on the existence of such information and materials other than information and materials establishing the factual innocence of the defendant.

20. This Office agrees that it will not seek additional upward specific offense characteristics, enhancements, or upward departures to or from the defendant's offense level beyond those, if any, specifically referred to in this Agreement, except that this Office shall have the right in its discretion to seek additional upward specific offense characteristics, enhancements, or upward departures to or from the defendant's offense level beyond those, if any, specifically referred to in this Agreement where any such additional upward specific offense

---

Evidence 410. No promises or inducements have been made to me other than those contained in this agreement. I am satisfied with the representation of my attorney in this matter.
Defendant \_\_\_\_\_ and Defense Counsel \_\_\_\_\_

15



characteristics, enhancements, or upward departures to or from the defendant's offense level would be based on conduct occurring after the defendant enters into this Agreement. The defendant agrees that he will be sentenced under the Sentencing Guidelines, and he may not argue for additional downward specific offense characteristics, reductions, variances, or downward departures to or from the defendant's offense level beyond those specifically referred to in this Agreement.[4] However, if the Probation Office recommends any specific offense characteristics, enhancements, reductions, or departures to or from the defendant's offense level other than those, if any, specifically referred to in this Agreement, the parties shall have the right but not the obligation to oppose any such recommendation or argument.

21. It is further agreed that should the conviction following defendant's plea of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement (including any counts that this Office has agreed not to prosecute or to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

22. This Plea Agreement between the parties is the entire agreement and understanding between the United States of America and the defendant.

---

[4] The parties agree that, consistent with Paragraph 10(b)(1) of this Plea Agreement, this provision does not preclude the defendant from arguing for a sentence within the Sentencing Guidelines but consistent with his view of the loss applicable under Section 2B1.1(b)(1)(K), and does not preclude the Government from arguing for a sentence consistent with the loss applicable under Section 2B1.1(b)(1)(L). In all events, defendant may argue for a sentence consistent with a Level 30, and the Government may oppose such an argument and argue for a sentence consistent with a Level 32.

16



There are no other agreements, promises, representations, or understandings.

                              WIFREDO A. FERRER
                              UNITED STATES ATTORNEY
                              SOUTHERN DISTRICT OF FLORIDA

Date: 7/31/14             By: _____
                              JERROB DUFFY
                              ASSISTANT UNITED STATES ATTORNEY

                              LORETTA E. LYNCH
                              UNITED STATES ATTORNEY
                              EASTERN DISTRICT OF NEW YORK

Date: 7/31/14             By: _____
                              WHITMAN G.S. KNAPP
                              ASSISTANT UNITED STATES ATTORNEY

Date: 12/2/2014           By: _____
                              SILVIA PINERA-VAZQUEZ, ESQ.
                              ATTORNEY FOR DEFENDANT

Date: 7/31/14             By: _____
                              DAVID GARVIN, ESQ.
                              ATTORNEY FOR DEFENDANT

Date: 7/31/14             By: _____
                              CARL FIORENTINO
                              DEFENDANT